## SULLIVAN, APPELLANT, v. GERMANIA LIFE INSURANCE COMPANY, RESPONDENT.

[Submitted February 21, 1895. Decided March 18, 1895.]

LIFE INSURANCE—*Authority of agent or manager of company.*—An arrangement entered into between the manager or general agent of a life insurance company and the holder of a policy issued by the former, whereby rentals due by such agent to the policy holder for offices rented for the company and private rooms for himself should be deemed payment of premiums, is wholly beyond the scope of his power as such agent, and is not binding upon the company, unless authorized by previous authority or subsequent sanction.

SAME—*Waiver of forfeiture—Ratification.*—A policy of life insurance was declared forfeited by the company for nonpayment of premiums, and one of the conditions in the policy was that agents could not waive forfeitures. After the forfeiture was declared the insured tendered the vice-president and general manager of the company the balance due on premiums, but the tender was peremptorily rejected. Previous to the tender there was a conversation between the insured and the general manager as to the agent's debt to the insured, and he was referred to the agent who issued the policy, with the state-

ment that whatever he did would be satisfactory; that he would "fix it up." The agent agreed to adjust the matter in accordance with an arrangement between himself and the insured, whereby premiums were to be paid by rents. *Held,* That the statements made by the general manager of the company to the insured were insufficient to establish a waiver of the forfeiture of the policy, and did not amount to a ratification of the unauthorized contract of the agent with the insured as to rents. (*Bank* v. *Hall,* 8 Mont. 341, cited.)

*Appeal from First Judicial District, Lewis and Clarke County.*

ACTION on a life insurance policy.   Judgment was rendered for the defendant below by BUCK, J.   Affirmed.

Statement of the case by the justice delivering the opinion:

The defendant pleads that it conducted its insurance business in Montana in 1889, 1890, and 1891, one Fred S. Doremus being the manager in Montana.   About November 20, 1889, the plaintiff and defendant entered into an agreement by which the plaintiff insured his life with defendant for $5,000. The policy was delivered November 30, 1889, and the premium for 1889, amounting to $263.15, was duly paid.   The complaint alleges payment for the premium due November 30, 1890, and that of the premium due November 30, 1891. Plaintiff paid $111.85 before November 1, 1891, and on November 6, 1891, offered and tendered to defendant the remainder of the premium due for 1891, to wit, $151.30, but defendant refused to accept the same, and has not given the plaintiff the receipt for the premium due and paid on November 30, 1890, but withholds the same and refuses to give plaintiff the receipt for $263.15 paid and tendered to defendant as the payment due November 30, 1891.   Plaintiff alleges that on November 6, 1891, the defendant declared said policy void, and refused to further deal with plaintiff; plaintiff has done every thing required to be done, wherefore he prays that the receipts for premiums paid and tendered be delivered by defendant to him on payment into court of said sum of $159.31, and, in the event of the failure to deliver said receipts, the plaintiff have judgment against defendant for $638.15.   Attached to the complaint as an exhibit A is a copy of the policy, in the usual form of dividend tontine insurance policies.   On the back of the policy are various conditions and agreements. One condition is, that if the premiums mentioned, or any of

them, shall not be paid on or before a number of the several days stipulated for the payment thereof, respectively, or within three days thereafter, respectively, the policy shall cease, and be null and void. A further condition is, that agents may receive premiums at or before the time when due only upon production and delivery of receipt of the secretary of the company, but cannot make, alter, or discharge contracts or waive forfeitures. The annual premium was $263.15.

The defendant, by answer, admits that about November 20, 1889, an insurance contract for $5,000 was entered into, but denies that it agreed to pay plaintiff the sum of $5,000, save and except as in accordance with the terms of the policy; admits the first payment of $263.15, but denies that of the premium due on November 30, 1890, there was any thing paid to defendant, as alleged in plaintiff's complaint; denies that of the premium due November 30, 1891, plaintiff paid $111.85, at any time; and denies, on information and belief, that on November 6, 1891, plaintiff tendered to defendant the remainder of said premium, to wit, $151.30. Defendant admits that it has not given plaintiff receipts for the 1890 premium, and says plaintiff was not entitled thereto; admits that it has not given plaintiff the receipt for 1891, and alleges that plaintiff refused and failed to pay the premium due, $263.15, for 1891.

The defendant pleads that the policy issued to plaintiff was canceled long prior to November 6, 1891; and affirmatively then sets forth that Fred S. Doremus, who was manager for the defendant in Montana, was indebted in 1890 to plaintiff in the sum of $375, for private rooms occupied by said Doremus in the Diamond Block, in Helena, of which block plaintiff was the owner; that plaintiff and said Doremus entered into an agreement, without any authority so to do, and without the knowledge or consent of this defendant, whereby said Doremus was to apply his private indebtedness to plaintiff in payment of the premium which plaintiff owed defendant for the year 1890; that prior to November 30, 1890, defendant was informed of the aforesaid agreement, and immediately notified plaintiff and said Doremus that it would not accept the same, and would not and did not ratify the act of its said agent Doremus in enter-

ing into said agreement, and would not accept the substitution of debtors, all of which plaintiff well knew before the premium for 1890 became due and payable; that said Fred S. Doremus did not pay defendant the premium due November 30, 1890; that on or about November 30, 1890, the day when said premium became due, defendant demanded payment of the $263.15, as premium, but plaintiff refused to pay; that defendant never agreed with plaintiff, or with the said Doremus, to accept the said substitution of debtors, as the contract of employment between defendant and Doremus prohibited the incurring of debts or obligations on the part of defendant, except by its written consent, of which contract plaintiff had knowledge before the 1890 premium became due; that on or about November 30, 1890, in consequence of the failure, refusal, and neglect of plaintiff to pay the defendant the 1890 premium, to wit, $263.15, the plaintiff's policy was declared null and void, in accordance with the conditions of said policy.

The plaintiff's replication denies the material matters of defendant's answer, and sets up that all the transactions with Doremus were with him as manager of the defendant corporation, and that a large portion of the rentals was for an office for defendant; pleads that the arrangement between plaintiff and Doremus as manager was ratified and indorsed by the defendant by its subsequent acts, and that said arrangement was made before the original delivery of the policy, and the policy delivered in pursuance to said arrangement; denies that the company ever notified plaintiff that it did not accept and ratify the aforesaid arrangement; denies that the company ever demanded payment of premiums alleged; and denies, on information and belief, that on or about November 30, 1890, the policy was declared null and void, but that if such act was done no notice thereof was ever communicated to plaintiff.

There was a trial to the court without a jury. At the conclusion of plaintiff's testimony defendant moved for a nonsuit. The court granted the motion, and entered judgment of dismissal in favor of the defendant for costs.

The plaintiff appeals from the judgment, and asks this court to review the order of the trial court granting the motion for nonsuit.

On the trial plaintiff swore that Fred S. Doremus, manager of the company, occupied insurance offices in the Gold Block, and rooms for his private uses in the Diamond Block, both of which he leased from plaintiff. At the solicitation of Doremus, plaintiff, about November, 1889, took a policy for $5,000, after Doremus had told him that the company were paying good rents to defendant, and a couple of months' rent each year would really pay for the insurance policy. He stated this before plaintiff agreed to take the policy and before its issuance. Plaintiff paid the first premium by four months' rent of rooms in the Diamond Block, and one month's rent of the offices. A memorandum showing private and office rent accounts, was made out at the time between plaintiff and Doremus.

At the end of that accounting the policy was delivered. The terms of the policy are outlined in the statement of the case.

Plaintiff further said that the foregoing transactions disposed of the business for a year.

In July or August of 1890 Doremus asked plaintiff if he would apply the room rent to the second year's premium. Plaintiff told him yes, and they entered into a settlement of accounts, evidenced by a memorandum, of private and office rents, which memorandum was as follows:

```
Nov.......................115
Dec........................115
Jany......................115
Feby......................115
Mrch......................115
Apl.......................115
May.......................115
June......................115
                          ————
                          $920 00
Cash, Policy.....................263 15
Check, Dec. 31...................195 00
       Apl. 10...................230 00
       May 29, Dep................ 50 00
       June 5....................180 00
                                 ————
                                 918 15
$30 00
```

Doremus accepted the memorandum, plaintiff issued receipts, and, so far as the premium of 1890 was concerned, the matter was settled. Doremus went away about August, 1890. Plaintiff wrote him that he had received a formal printed notice of the premium for 1890 becoming due; this was in November, 1890, and he wished Doremus would attend to it, and see that his receipt was forthcoming. Doremus said he would attend to it. The agreement that subsequent rents should be applied to the 1891 premium was by letter.

When the insurance was made in the first place there was talk, and it was understood in a general way, about applying the rents to the premiums, and that rents should apply to the premiums. It did not make any difference whether the company credited it up with the rent, or whether plaintiff tendered defendant a check and he returned the rent. They also corresponded about the 1891 receipt. Doremus said he would attend to it, and to continue applying rents to the policy of 1891 until he returned.

In July, 1891, plaintiff saw Fred Doremus in New York. He was then occupying a room marked "Resident" or "Metropolitan" Manager. He excused himself for his negligence in forwarding the receipt for 1890. He said he would mail it at once. It never came.

In November, 1891, plaintiff and J. W. Kinsley, Esq., went to New York. They called upon Cornelius Doremus, father of Fred, whose office was at the headquarters of the company. Plaintiff offered the printed notice that the premium for 1890 on his policy would be due at the Helena agency on November 30, 1890, and, "if not paid on or before that date, the policy, and all payments thereon, will become forfeited and void, except as otherwise provided in the policy." This notice was signed by Cornelius Doremus as vice-president.

Plaintiff then mentioned to Doremus, Sr., that he had not received his 1890 receipt, and the 1891 premium would soon be due, and that he would like to settle the matter up. Plaintiff thinks the conversation drifted as to how the premium had been paid in the first instance. Doremus, Sr., said that Fred was not in, but, if he would return, no doubt he would find him, and "fix matters up." The next morning plaintiff and

Mr. Kinsley saw Fred. Fred told them that his father would do nothing with the "matter of receipts." Doremus, Sr., interrupted the interview. Plaintiff tendered to Doremus, Sr., the balance due on the 1891 premium, and demanded his receipts for 1890 and 1891. Doremus, Sr., by reason of previous "general talk" of contracts with Fred, knew the situation very well. Plaintiff thinks that at the July interview with Doremus, Sr., he had told him of the arrangements between himself and Fred. At the first interview in November, Doremus, Sr., said he did not remember any thing about the matter. "I don't know," said Doremus, Sr., "I will go and see." He went to the book-keeper, and returned with a piece of paper, which plaintiff read. Plaintiff said the 1891 premium was not due until the 30th of November, but, being in New York, he thought he would straighten the matter up. Doremus, Sr., said Fred, who had attended to those matters, would be in shortly, and "will fix it up. If there is any mistake about it will correct it, no doubt. Whatever he does will be satisfactory. I don't understand this, but if you will wait I think he will be in shortly." The paper referred to was as follows:

83278      Nov. 30, '89
$5000.      26315       20 En. Tont. 20.
   Nov. '89.
      Lapsed
         '91.

Plaintiff further testified, on cross-examination, that he never took any steps to learn the authority or scope of the agency of Fred Doremus; knew nothing about it, and that, when the agreement about applying his private debts for his room rent on the company's account was made, he presumed that by reason of the status of the company, and the relationship of Fred to a high official in the company, it would not be necessary to inquire into the authority of Fred Doremus. Plaintiff never received any cash from the company for office rent, but got checks. In the first premium of 1889 there was one month of office rent included, $65, but the rest of that premium was for private apartments occupied by Doremus and Duryee in the Diamond Block. No demand, except the notice hereinbefore referred to, for the 1890 premium, was made. The Diamond Block rent

was $50 a month.   Plaintiff read the policy, and had made a demand for the receipt for the 1890 premium in 1891, before the time of his visit to New York.   But he never wrote to the home office, and never gave the home office any information of the arrangement between himself and Fred until the New York visit in 1891.

On redirect examination the witness testified that he informed one Haltman, who conducted the business in Helena after Fred Doremus left, that the 1890 premium was arranged with Fred, but plaintiff did not tell him what the arrangements were.

The company has never returned the amount of the premiums paid, and when the money was tendered in New York Doremus, Sr., refused it.

Mr. Kinsley testified as follows: that he visited the company's office in New York four times; that Cornelius Doremus was vicepresident and manager of the company at that time.   Kinsley's first visit was on November 6, 1891; he tendered $151 to a bookkeeper, asking for a receipt of Sullivan's premium for 1891. The book-keeper told him the premium was $263.15, and referred him to Fred Doremus or his father.   Sullivan and Kinsley thereafter had an interview with Doremus, Sr.   The book-keeper handed the slip to Doremus, Sr., testified to by Sullivan, to the effect that the policy had lapsed in 1891. Doremus told him to see Fred, and "whatever he says about it goes."   Mr. Kinsley further testified that Mr. Sullivan told Doremus, Sr., that the premium of 1890 and this much of 1891 had been paid by the rent for offices and rooms, and that it was in response to that explanation that he said "whatever Fred says goes."   Fred came in, and Doremus, Sr., then said, "You go in and see Fred, and fix that matter up."   Mr. Kinsley showed the figures to Fred.   Fred said it was all right, and "that he would see his father and get the receipts, and to come in the morning and it would be all right, but declined to receive the $151."   On November 7th Fred said that he had spoken to his father, who would do nothing.   Doremus, Sr., about that time came in, and excitedly told them that there was "nothing there belonging to them, and nothing they could get."   The tender of $151 was then made and refused.

There was some testimony to the effect that premiums were often paid at the office of Doremus and Haltman, managers of the company in Helena, but it was unimportant in the consideration of this case.

*J. W. Kinsley* and *Thomas C. Bach*, for Appellant.

I.   Fred Doremus, being general manager of the defendant for Montana and Idaho, and authorized to deliver policies, his authority was as complete and full as any officer of the company, and, in the absence of fraud, he could waive any condition and bind the company by any agreement as to payment of premiums and manner of payment different from the terms of the policy, as well as any officer of the company. (*Standard etc. Ins. Co.* v. *Friedenthal*, 27 Pac. Rep. 88; *Brooklyn L. Ins. Co.* v. *Miller*, 12 Wall. 285; *Taylor* v. *Insurance Co.*, 9 How. 390; *White* v. *Connecticut Ins. Co.*, 120 Mass. 330; *Sheldon* v. *Connecticut Ins. Co.*, 25 Conn. 207; *Bouton* v. *Insurance Co.*, 25 Conn. 542; *Woody* v *Insurance Co.*, 31 Gratt. 362; *Chickering* v. *Insurance Co.*, 116 Mass. 268; *Farnam* v. *Insurance Co.*, 83 Cal. 246; *Wright* v. *Insurance Co.*, 12 Mont. 474; *Bodine* v. *Insurance Co.*, 51 N. Y. 117; *Sheldon* v. *Insurance Co.*, 25 N. Y. 460; *Knox* v. *Insurance Co.*, 50 Wis. 671; *Dean* v. *Insurance Co.*, 62 N. Y. 642; *Van Schaick* v. *Insurance Co.*, 68 N. Y. 437; *Electric L. Ins. Co.* v. *Fahrenkrug*, 68 Ill. 463; *F. & M. Ins. Co.* v. *Chestnut*, 50 Ill. 118; *Ætna Ins. Co.* v. *Maguire*, 51 Ill. 342; *Easton R. R. Co.* v. *Relief Ins. Co.*, 105 Mass. 577; *Alexander* v. *Insurance Co.*, 67 Wis. 427; *Phœnix Ins. Co.* v. *Hinesly*, 75 Ind. 1; *Boehm* v. *Insurance Co.*, 35 N. Y. 13; *Steen* v. *Insurance Co.*, 89 N. Y. 316; *Pechner* v. *Insurance Co.*, 65 N. Y. 198; *Pitney* v. *Insurance Co.*, 65 N. Y. 6; *Richmond* v. *Insurance Co.*, 79 N. Y. 230; *Southern L. Ins. Co.* v. *McCain*, 96 U. S. 86; *Murphy* v. *Insurance Co.*, 3 Baxt. 442; *Hallock* v. *Insurance Co.*, 26 N. J. L. 268; *Elkins* v. *Insurance Co.*, 113 Pa. St. 386; *City of Davenport* v. *Insurance Co.*, 17 Iowa, 276; *New York L. Ins. Co.* v. *Stone*, 42 Mo. App. 383; *Cont. Ins. Co.* v. *Ruchman*, 127 Ill. 364; *Hartford L. etc. Ins. Co.* v. *Hayden*, 90 Ky. 39; *Alexander* v. *Insurance Co.*, 67 Wis. 422; *Home Ins.*

Co. v. *Pierce,* 75 Ill. 426; *Winne* v. *Insurance Co.,* 91 N. Y. 186; *Krumm* v. *Insurance Co.,* 40 Ohio St. 225.)

II.   1. When an agent makes a contract beyond his power the principal cannot affirm in part and deny the rest—he cannot accept what is advantageous and reject the remainder; and 2. When, under such a state of facts the principal decides to disaffirm the act of his agent, he must return to the injured party whatever of advantage he may have received, and failure so to do ratifies the contract. (*Beal* v. *Insurance Co.,* 16 Wis. 257; *Southern Ins. Co.* v. *McCain,* 96 U. S. 84; *In re Insurance Co.,* 22 Fed. Rep. 109; *Monitor Ins. Co.* v. *Buffum,* 115 Mass. 343; *Globe Ins. Co.* v. *Wolf,* 95 U. S. 326; *North Western Iron Co.* v. *Insurance Co.,* 26 Wis. 78; *Johnson* v. *Insurance Co.,* 79 Ky. 403; *Carpenter* v. *Insurance Co.,* 61 Mich. 635; *Knox* v. *Insurance Co., supra; Evans* v. *Buckner,* 1 Heisk. 291; *Southern Life Ins. Co.* v. *Bosker,* 7 Heisk. 606; *Benninghoff* v. *Insurance Co.,* 93 N. Y. 495; *Dillebar* v. *Insurance Co.,* 76 N. Y. 569; *Pike* v. *Douglas,* 28 Ark. 59; *Parish* v. *Reeves,* 63 Wis. 315; Story on Agency, 9th ed., §§ 244, 255, 256, 258; Mechem on Agency, §§ 130–146.)

III.   If the appellant is correct upon either the first or second point in this brief, then the contract of insurance was in force at the second interview of November, 1891, at which time the company refusing to longer recognize the contract, such act terminated, at the plaintiff's option, the contract, and the plaintiff may sue for the return of premiums with interest. (*Lovell* v. *Insurance Co.,* 111 U. S. 264; *Insurance Co.* v. *Fletcher,* 117 U. S. 519; *Braswell* v. *Insurance Co.,* 75 N. C. 8; *McCall* v. *Insurance Co.,* 9 W. Va. 237.)

*R. R. Purcell,* and *H. G. McIntire,* for Respondents.

It is fundamental that if the entire amount due the company at the time of the cancellation of a policy has not been paid the company is not liable. (*Garlich* v. *Insurance Co.,* 44 Iowa, 553.) If the plaintiff's evidence is insufficient to warrant a court or judge in finding a verdict in his favor, and if the defendant's evidence does not supply the defect and show that all the evidence in the case is legally competent to sustain a verdict for the plaintiff, a motion for a nonsuit should

be granted. (*Pillsbury* v. *Pillsbury,* 20 N. H. 90; *Fletcher* v. *Thompson,* 55 N. H. 308; *Oakes* v. *Thornton,* 28 N. H. 44.) Agent Doremus had no authority to compromise with policy-holders as in this case. No authority is found in which an agent's power has been extended to this point. (*Catoir* v. *Insurance Co.,* 33 N. J. L. 487; *Huffman* v. *Insurance Co.,* 92 U. S. 161; *Franklin L. Ins. Co.* v. *Sufton,* 53 Ind. 380; *Union Mut. L. Ins. Co.* v. *McMullen,* 24 Ohio St. 67; *Mersereau* v. *Phœnix,* 66 N. Y. 274; *Davis* v. *Massachusetts Mut. Ins. Co.,* 13 Blatchf. 462; *Howe* v. *Union Mut. Ins. Co.,* 80 N. Y. 32.) The unauthorized delivery of property of his principal by the agent to his creditor, in payment of his own debt, is not a sale. (*Gould* v. *Blodgett,* 61 N. H. 115; *St. Louis Carriage Mfg. Co.* v. *Hilbert,* 24 Mo. App. 338.) A party who seeks to charge a a principal for the contract made by his agent must prove the agent's authority, and it is not for the principal to disprove it, the burden being always on the plaintiff. (*Schultz* v. *Jordan,* 141 U. S. 709; *Bank* v. *Hall,* 8 Mont. 346.) The agent cannot substitute his own debt for the debt due his principal, or commute it for some thing else, but must receive payment in cash. (*McAlpine* v. *Cassady,* 17 Tex. 449; *Co-operative L. Ins. Co.* v. *McConnico,* 33 Miss. 233; *Insurance Co.* v. *Davidge,* 51 Tex. 244; *Ferebee* v. *Insurance Co.,* 68 N. C. 356; *Hoffman* v. *Insurance Co.,* 92 U. S. 161; *Merchants' Mutual Ins. Co.* v. *Excelsior Ins. Co.,* 4 Mo. App. 578; *Bartlett* v. *Pendland,* 10 Barn. & C. 760; *Todd* v. *Reed,* 4 Barn. & Ald. 210.) Generally, an agent has no right to receive in payment any thing except money, unless specially authorized to do so by his principal. (Benjamin on Sales, § 1099; *Aultman* v. *Lee,* 43 Iowa, 404; *Drain* v. *Daggett,* 41 Iowa, 648; *Wheeler etc. Mfg. Co.* v. *Giran,* 65 Mo. 89; *Herring* v. *Hollendorf,* 74 N. C. 588; *Wiley* v. *Mahood,* 10 W. Va. 206; *Williams* v. *Johnson,* 92 N. C. 532; *McCormick* v. *Keith,* 8 Neb. 145.) Conceding that the authority of a general agent extended to the settlement or compromise of the plaintiff's claim, it would by no means follow that he could extinguish a debt to his principal by setting off against it his own debt. (*Graydon* v. *Patterson,* 13 Iowa, 256; *Hall* v. *Storrs,* 7 Wis. 217; *Higgins* v. *Moore,* 34 N. Y. 417; *Berholf* v. *Quinlan,* 68 Ill. 297; *Guerreiro* v. *Peile,* 3 Barn. &

Ald. 616; *Howard* v. *Chapman*, 4 Barn. & C. 508; *Kuckein* v. *Wilson*, 4 Barn. & Ald. 443; *Parsons* v. *Webb*, 23 N. J. Eq. 38; *Benny* v. *Rhodes*, 18 Mo. 147; *Stewart* v. *Woodward*, 50 Vt. 81; *Lea Point* v. *Scott*, 36 Vt. 608; *Reynolds* v. *Farree*, 86 Ill. 570; *Trudo* v. *Anderson*, 10 Mich. 357; *Burger* v. *Limback*, 42 Mich. 162; *McCullough* v. *McKee*, 16 Pa. St. 289; *Kendall* v. *Wade*, 5 La. Ann. 157.)    The thing attempted was a novation.    But, to constitute a novation, it is necessary that each of the three parties concerned should know of and consent to the arrangement.    In this case the arrangement was without the knowledge or consent of the defendant company.    A novation requires the consent of all parties.    (*Grover* v. *Sims*, 5 Blackf. 498; *Morris* v. *Whitmore*, 27 Ind. 418; *Porter* v. *Dearinger*, 33 Ind. 155; *Helms* v. *Kearns*, 40 Ind. 124; *Nichols* v. *Glover*, 41 Ind. 24; *Jewett* v. *Pleak*, 43 Ind. 368; *Leihy* v. *Briggs*, 33 Ill. App. 534; *Bowen* v. *Railroad Co.*, 34 S. C. 217; *Haubert* v. *Manschardt*, 89 Cal. 433; *Cornwell* v. *Megins*, 39 Minn. 407.)    It cannot be claimed that the agreement of agent Doremus to pay the company, upon the plaintiff's cancellation of the debt due him from Doremus, was a waiver.    The decisions to this effect are numerous and strong.    (See *Cronkling* v. *Accidental Ins. Co.*, 35 Fed. Rep. 26; *Bane* v. *Insurance Co.*, 85 Ky. 677; *Belleville etc. Ins. Co.* v. *Van Winkle*, 12 N. J. Eq. 333; *Buffum* v. *Insurance Co.*, 3 Allen, 360; *Garlick* v. *Insurance Co.*, *supra.*)

HUNT, J.—We are very clearly of the opinion that the arrangement or agreement made by Fred Doremus with Sullivan, whereby the rentals due by Doremus to Sullivan for his private apartments should be deemed payment of plaintiff's premium, was wholly beyond the scope of Doremus' power as the manager or general agent of the defendant company, and was not binding upon the company, unless authorized by previous authority or subsequent sanction.    "Whatever an agent does can be done only in the way usual in the line of business in which he is acting.    There is an implication to this effect arising from the nature of his employment, and it is as effectual as if it had been expressed in the most formal terms.    It is present whenever his authority is called into activity, and

prescribes the manner, as well as the limit, of its exercise."
(*Hoffman* v. *Hancock Ins. Co.,* 92 U. S. 161; *Gould* v. *Blodgett,* 61 N. H. 115; Benjamin on Sales, § 1099.)

But appellant contends, with much earnestness, that, even if the arrangement referred to was beyond the scope of the agent's power, there was an affirmance of it, and that plaintiff may recover upon the familiar principle that, when an agent makes a contract beyond his power, the principal cannot ratify any part of the unauthorized contract, but must ratify the whole of it, or, as plaintiff well expresses the rule, "he cannot accept what is advantageous and reject the remainder."

The facts, however, prevent the application of the principle invoked to the case under consideration. The company, being ignorant of and in no way bound by the agreement of its agent with relation to his private debts, had a right to rest upon the conditions of its policy, which provided, among others, as follows:

"CONDITIONS AND AGREEMENTS OF THIS INSURANCE.

"This policy shall cease and be null, void, and of no effect, and the company shall not be liable for the payment of the sum assured, or any part thereof, but all premiums previously paid shall be the absolute property of the company, without any account whatever to be rendered therefor.

"*Permanent conditions:* 1st. (Payment of premiums.) If the premiums mentioned within, or any of them, shall not be paid on or before noon of the several days stipulated for the payment thereof respectively, or *within three days thereof* respectively."

"Agents holding an appointment from the company are authorized to receive premiums at or before the time when due only upon production and delivery of the receipt of the secretary of the company, but not to make, alter, or discharge contracts or waive forfeitures."

Mr. Sullivan knew by the provisions of the contract of insurance entered into between himself and the defendant that the premium for 1890 would be due November 30th. Instead of paying it, he communicated with the agent Doremus, and relied upon him to relieve himself (Sullivan) of the liability to the defendant because of the private contract which they

had entered into concerning the rentals of apartments. Such arrangement, however, being without defendant's knowledge when entered into, was a fraud on Doremus' part against his principal, and cannot bind the company, unless subsequently ratified by it. (*Huffman* v. *Insurance Co.*, 92 U. S. 161; *Castoir* v. *Insurance Co.*, 33 N. J. L. 487.)

The plaintiff ought to have inquired into the authority of the agent Doremus when entering into the arrangements made. He seems in good faith to have relied upon the character of the defendant's agent, and the general reputation of the company, but his mistaken confidence in the personal integrity of Fred Doremus cannot, under all the facts, affect the company in this matter, or relieve him from the consequence of his failure to pay the premium for 1890 on November 30th, or within the prescribed time thereafter.

In *First Nat. Bank* v. *Hall*, 8 Mont. 341, it was said, in relation to the reliance placed upon the authority, or the supposed authority, of an agent: "This transaction appears to have been entered into by the bank without sufficient scrutiny into the authority of Camp. While hardship may result from such confidence, it is better so than to relax the familiar rule, that an agent cannot bind his principal by acts done without authority, and that other rule that all persons dealing with an agent are bound to ascertain the scope of his authority, or otherwise they act at their peril. (*Blum* v. *Robertson*, 24 Cal. 140, and cases cited.)"

The plaintiff argues that by reason of the information given by him to Doremus, Sr., secretary and general manager, in July, 1891, of the arrangement between himself and Fred, and by the silence of Doremus, Sr., at that time, as well as by his statements made in November, 1891, the company ratified such agreement; but it must be remembered that, by the terms of the policy itself, the contract of the plaintiff had not been carried out, because, when he failed to pay the cash premium due in November, 1890, or soon thereafter, his policy had become null and void, and the company could claim a forfeiture thereof.

In *New York Life Ins. Co.* v. *Statham*, 93 U. S. 24, the court, with great ability, state the reason and necessity for

promptness in the payment of life insurance premiums, in the following language: "All the calculations of the insurance company are based on the hypothesis of prompt payments. They not only calculate on the receipt of the premiums when due, but on compounding interest upon them. It is on this basis that they are enabled to offer assurance at the favorable rates they do. Forfeiture for nonpayment is a necessary means for protecting themselves from embarrassment. Unless it were enforceable the business would be thrown into utter confusion. It is like the forfeiture of shares in mining enterprises, and all other hazardous undertakings. There must be power to cut off unprofitable members, or the success of the whole scheme is endangered. The insured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not. Each is interested in the engagements of all; for out of the coexistence of many risks arises the law of average, which underlies the whole business. An essential feature of this scheme is the mathematical calculations referred to, on which the premiums and amounts assured are based. And these calculations, again, are based on the assumption of average mortality, and of prompt payments and compound interest thereon. Delinquency cannot be tolerated nor redeemed, except at the option of the company. This has always been the understanding and the practice in this department of business. Some companies, it is true, accord a grace of thirty days, or other fixed period, within which the premium in arrear may be paid, on certain conditions of continued good health, etc. But this is a matter of stipulation, or of discretion, on the part of the particular company. When no stipulation exists it is the general understanding that time is material, and that the forfeiture is absolute if the premium be not paid. The extraordinary, and even desperate, efforts sometimes made, when an insured person is *in extremis,* to meet a premium coming due, demonstrates the common view of this matter."

We regard the statements made by plaintiff to Fred Doremus in July, 1891, as wholly immaterial. And we may assume that there could have been a waiver of the forfeiture by the consent of Cornelius Doremus, as secretary and general

manager; yet, we can find no act, express or implied, on the part of Doremus, Sr., as general manager, from which the court can fairly infer that there was any approval of the unauthorized acts of defendant's agent, Fred, or any waiver on the company's part of the forfeiture of plaintiff's policy, which had occurred long before the interviews, and by operation of the policy itself. The silence of Doremus, Sr., at the July interview was not a waiver, nor was the company at that time obliged to do or say any thing to make the forfeiture effectual. (*Titus* v. *Glenns Falls Ins. Co.*, 81 N. Y. 410.)

Coming to the November, 1891, interviews the fact must be always borne in mind that the policy of plaintiff had lapsed—it was dead. Plaintiff told Doremus, Sr., that he would like to pay both premiums. "I had had some correspondence," testified plaintiff, "with Fred in regard to the matter, and he had been a little slow. I don't know whether the conversation drifted at that time as to how the premium had been paid in the first instance, but I think it did. When I spoke to him about the amount of the premium which was due in 1891 I believe I told him what amount was due. I did not make any tender to him at that time." Doremus, Sr., said Fred was not in, and, "if I would come in in the afternoon, no doubt I would find him and fix matters up. The next morning I saw Fred Doremus. I went there at that time expecting to get every thing all straightened up, and fixed up, and receipts, and I was rather surprised and disappointed from his conversation soon after getting to his office, but his father, as he said, would not do any thing with it, would not do any thing with the matter of receipts." Doremus, Sr., then came in, and said "that he proposed to take a hand in this matter; that he would not allow his son to be bulldozed, nor the company either, and, if we wanted any thing from this company, we would have to get it." The tender of the $151 was then made and peremptorily refused. "There was talk previous to this about the contract which I had with Mr. Fred Doremus; there had been a general talk about it previous to that time. He knew the situation very well. I knew he knew the situation by conversation with him. I had told him the arrangements that were made that I have testified to here. I

think that was at my interview with him in July. I explained as to the first premium, the second, and also the premium for 1891. There was not much further conversation took place at this November interview." Just before the notice that the policy had lapsed was presented, "he [Doremus, Sr.] said 'I don't remember any thing about it. I don't know. I will go and see.' He went to the book-keeper and presently brought back that paper, and he says, 'The book-keeper says this lapsed in 1891.' He laid the piece of paper down on the desk. I read the paper. I said, ' No, I guess it cannot be lapsed, it is n't due until the 30th of this month, but, inasmuch as I was here, I thought I would step in and straighten the matter up, and, whatever balance there was, pay it.' He said, 'It is a matter I have not paid much attention to.' He said, 'Fred will be here shortly. He will fix it up. If there is any mistake about it will correct it, no doubt.' He said Fred had been attending to those matters, 'and if there is any mistake he will make it all right; whatever he does will be satisfactory.' He says, 'I don't understand this,' but, he says, 'If you will wait I think he will be in shortly.' "

After carefully considering all the statements made to the plaintiff by the general agent we find them insufficient to establish a waiver of the forfeiture of the policy. And it is significant in interpreting the words, and the whole conduct of Doremus, Sr., that the tender of the plaintiff was always, and even aggressively, refused; that plaintiff was always told, after investigation by Doremus, Sr., that his policy had lapsed; that the receipt for the premium was never offered to him, and that no recognition of any agreement between plaintiff and Fred was ever made in behalf of the company. It is plain, too, that Doremus, Sr., in referring plaintiff to his son, did not delegate, and did not mean to delegate, any authority to Fred to waive the forfeiture, or to do any other act which would bind the company. He was most careful to avoid doing so himself, and it is altogether unreasonable to construe the facts and circumstances attending his actions in any other light.

Being of opinion, therefore, that, at the time of the New York interview, the plaintiff's policy was forfeited, and null

and void, and that it was not revived, and that there was no act of the company at any time ratifying the unauthorized conduct of its agent, and that there was no waiver of any rights by the company, it follows that the district court correctly granted the motion for nonsuit.

The plaintiff's situation is precisely described in the case of *Ferebee* v. *North Carolina Mut. Home Ins. Co.*, 68 N. C. 11, where the court say: "The plaintiff risked every thing upon his private arrangement with Speed, and paid no attention to the warnings of the company. This was his misfortune, and he is now left to his action against Speed for damages, but has no claim upon a company with which he contracted upon certain conditions, which conditions have never been fulfilled on his part, although he was (repeatedly) requested to do so." The judgment is affirmed.

*Affirmed.*

DE WITT, J., concurs.